Upon review of the competent evidence of record, and finding no good grounds to receive further evidence or rehear the parties or their representatives, the Full Commission, upon reconsideration of the evidence, affirms the Opinion and Award of the Deputy Commissioner.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Commission has jurisdiction over this matter.
2. All parties are subject to and bound by the North Carolina Workers Compensation Act.
3. All parties have been properly designated, and there is no question as the joinder or non-joinder of parties.
4. An employer-employee relationship existed between plaintiff-employee and defendant-employer.
5. Plaintiff alleges to have sustained an occupational disease on 21 June 1995.
6. Plaintiff was paid for the entire day of the alleged incident.
7. Plaintiffs average weekly wage was $1,131.00, which results in the maximum compensation rate for 1995 of $478.00.
8. Plaintiff was paid temporary total disability benefits from 22 June 1995 through 20 September 1995.
9. Plaintiff returned to work on 21 September 1995 for another employer.
In addition, the parties submitted a packet of stipulated documents at the hearing before the Deputy Commissioner and subsequently submitted a packet of records from the Veterans Administration, which were also stipulated into evidence.
***********
Based upon the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a thirty-three year old high school graduate. Plaintiff was an ironworker apprentice in 1995. To qualify for that position, he had to be a certified welder, a certified rigger, and he had to be able to climb. As an ironworker, he would work for a period of weeks or months on a project and then would be laid off. It was normal for ironworkers to work for a number of employers. However, plaintiff had had problems maintaining employment for the duration of a given project. In June 1994, he sought treatment with the Veterans Administration (VA) for depression and uncontrollable aggressive behavior. At that time, plaintiff indicated that he had difficulty maintaining a job for an extended period of time because he would usually get into an argument with his employer. Plaintiff was treated with Lithium and his symptoms improved considerably. However, by the end of the year, plaintiff was not taking his medication regularly.
2. In June 1995, plaintiff was working on a job at Reigelwood Paper for defendant-employer during a shutdown of the paper mill. His crew was rebuilding a boiler. On 21 June 1995, while he was working inside some ductwork using a cutting torch, blowers suddenly came on which blew air containing unknown chemicals through the duct where he was working. After a couple of minutes, the blowers stopped and plaintiff was able to climb out of the duct. He was coughing and his lungs were burning. However, plaintiff was able to work the remainder of his shift.
3. The next day, plaintiff was quite ill with shortness of breath and a productive cough, so his employer sent him to the emergency room. He was found to be very hypoxic so he was admitted to the hospital for oxygen therapy and testing. Dr. Gonzalez and Dr. Allen treated him at the hospital for what was diagnosed as chemical pneumonitis, cough, bronchospasm, hypoxia, and hilar adenopathy. Plaintiffs condition improved with medication, but on 27 June 1995, he developed the sudden onset of chest pressure and pain with shortness of breath. Dr.Harper, a cardiologist, was consulted. Although plaintiffs symptoms were consistent with angina, enzyme testing was negative for a myocardial infarction and a cardiac catheterization revealed no evidence of organic heart disease. Dr. Harper was unable to determine the etiology of plaintiffs chest pain and could not determine whether the chest pain was related to the recent chemical exposure.
4. On 30 June 1995, plaintiff was discharged from the hospital in Wilmington with instructions to rest for two weeks and to follow-up with a doctor in the Richmond area, which was near his home. On 3 July 1995, plaintiff was treated by Dr. Rizk, who monitored his medication. After experiencing some chest pain, plaintiff returned to Dr. Rizk on 17 July 1995. He was referred to Dr. Hammond, a cardiologist in the area. Dr. Hammond thought that it was unlikely that plaintiffs chest pain was due to coronary arterial spasm and that esophageal spasm was a more likely explanation for his problems. No further testing was recommended except that Dr. Hammond advised plaintiff to have his blood gases checked before he returned to work.
5. Plaintiff returned to work in September 1995.
6. Defendants initially admitted liability for benefits under the Act for plaintiffs lung condition by filing a Form 63 Notice to Employee of Payment of Compensation Without Prejudice to Later Deny the Claim, but the parties subsequently executed a Form 21 Agreement for Compensation for Disability that was approved by the Commission. Defendants paid compensation to plaintiff for temporary total disability until 20 September 1995.
7. Plaintiff apparently received no further medical treatment until April 1996 when he tried to commit suicide. On 25 April 1996, plaintiff presented to the VA Hospital where he reported problems with unstable mood, separation from his wife, and a bitter custody battle over their two children. However, plaintiff denied having problems at work and indicated that he was doing well as an ironworker. Although the examining physician questioned whether plaintiff was engaged in legal maneuvering, he prescribed the medications that plaintiff requested.
8. In August 1996, plaintiff went to Dr. Campbell for symptoms of an upper respiratory infection and reflux. He reported that he had cut a galvanized pipe the week before and now had lethargy, nausea, headache, cough, and pain in his chest. In September 1996, plaintiff was treated for a flash burn to his eyes from welding. He also went back to the VA Hospital for psychiatric treatment that month. Although he and his wife were back together, plaintiff was experiencing episodes of aggressive behavior and was on probation for an assault. Plaintiff had not been taking his medication properly, reportedly due to the increased costs. A psychiatrist diagnosed plaintiff with depression and questionable bipolar disorder. The psychiatrist indicated that plaintiff was status post several motor vehicle accidents, that he had employment issues, and there was marital discord. It was also noted that plaintiff occasionally used cocaine and marijuana. He was hospitalized for treatment in October, but he left after two days despite the fact the psychiatrist recommended that he stay.
9. During the time of his hospitalization in October 1996, plaintiff reported that he was working sixty to seventy hours per week in construction.
10. Shortly after his discharge from the VA Hospital, plaintiff went to Dr. Campbell and requested a reevaluation regarding the pneumonia that he had experienced the previous year. He complained of some occasional shortness of breath, especially in the summer. Spirometry testing revealed mildly diminished FVC and FEV1 , but plaintiff had not given full effort on the tests. Consequently, Dr. Campbell could not find any significant pulmonary impairment that would inhibit his occupational performance.
11. On 14 January 1997, plaintiff reported to the VA Hospital as a walk-in patient. He and his wife reported that he had mood swings every few hours, that he would become very angry and aggressive over minor issues, and that he would also be depressed and suicidal at times. Plaintiff had been working, but not during the previous week, and he was on probation for assault. In view of the history of suicide and violence when his mental illness was out of control, plaintiff was admitted to the psychiatric floor of the hospital. During this hospitalization, he had a physical examination as well as a psychiatric evaluation. He complained of low back pain and pain in his hips, shoulder, and jaw. However, there was no record of any complaint regarding his lungs and his lungs were clear on examination. Psychological testing indicated that plaintiff had significant cluster B personality traits, mostly borderline but also antisocial and sadistic with paranoia, psychosis, and occasional mania. His symptoms were not typical for bipolar disorder so he was ultimately diagnosed with a non-specific psychosis. When plaintiff was discharged on 29 January 1997, his condition had improved on medication. Later that night, plaintiff returned to the hospital after having an episode of grogginess and dizziness. Since he still claimed to be suicidal, he was readmitted. During that admission, he indicated that he did not know how he would be able to work and wanted his bipolar disorder to be service connected. Plaintiffs condition was found to be stable and he was discharged from the hospital the next day.
12. On 3 February 1997, plaintiff went to Dr. Green, a pulmonary specialist. He described the incident of 21 June 1995 and reported that he had had recurrent upper respiratory tract infections, significant shortness of breath, a regular productive cough, and wheezing associated with certain exposures since the incident at work. Plaintiff also reported that he had not worked since the incident. Except for certain information about the incident itself, none of what plaintiff reported was true. Dr. Green ordered pulmonary function tests that were interpreted as abnormal, but were also reported to be less than accurate, possibly due to inconsistent effort on the part of the patient. Dr. Green assumed that the history and tests results were true and diagnosed plaintiff with asthma, for which he prescribed oral medication and inhalers.
13. That same month, plaintiff returned to the VA clinic stating that he could not work any more, that he had hurt people at work, and that he had walked off of jobs. He reported racing thoughts, increased irritability, spending sprees at times, and other times where he slept on and off all day. A social worker counseled plaintiff and recommended that he return to the clinic so that a psychiatrist could evaluate his medication. However, plaintiff did not return to the clinic until 28 March 1997. At that time, he had stopped taking all of his medications. The doctor who treated him in March prescribed Lithium and Zoloft.
14. There was no record of plaintiff receiving further medical treatment until December 1997 when he went back to Dr. Campbell complaining of rapid weight loss, sweats, fatigue, and a bad cough. Dr. Campbell treated him for a respiratory illness. In March 1998, plaintiff sought treatment from Dr. Green for his continuing symptoms. Dr. Green ordered laboratory tests that revealed that plaintiff was markedly hyperthyroid. Consequently, plaintiff was referred to an endocrinologist. He subsequently returned to Dr. Green in May and October of 1998 for alleged asthmatic symptoms. Dr. Green was rather puzzled by plaintiffs complaints because he appeared so comfortable and his symptoms were so out of proportion to the findings on examination. Plaintiff remained on the same medication.
15. In January 1998, defendants sent plaintiff to Dr. Radow, who was also a pulmonologist, for evaluation. Plaintiff again gave an inaccurate history of chronic and severe symptoms since the incident at work in June 1995. Dr. Radow assumed that plaintiff was truthful about his patient history. Consequently, Dr. Radow diagnosed plaintiff with asthma and recommended that he add steroid medication to his other prescriptions.
16. Plaintiff has claimed that he experienced continuing problems with shortness of breath, cough, and other symptoms of asthma since 21 June 1995 and that his symptoms have continuously impaired his ability to work. Throughout the time that he was treated at the VA Hospital, he reported no problems with his breathing. Plaintiff repeatedly indicated that he was working and, except for his temper problems, had no difficulty at work. There were no records of any breathing problems from August 1995 until August 1996 when plaintiff had what appeared to be an acute upper respiratory infection. The Full Commission finds that plaintiffs claims of continuing respiratory problems since the 21 June 1995 incident are not credible.
17. As of October 1996 when Dr. Campbell evaluated him, plaintiff had no pulmonary impairment. Although Dr. Green and Dr. Radow subsequently diagnosed him with asthma, they based their diagnoses on inaccurate patient information, which was provided by plaintiff and upon pulmonary function tests, which were totally dependent upon the full cooperation of the patient. The results of the pulmonary function tests were not accurate because plaintiff did not give full effort. By October 1998, Dr. Green, who had relied on plaintiffs patient history, noted that plaintiffs complaints were well out of proportion to his findings.
18. Plaintiff had a serious personality disorder and psychiatric illness prior to the incident in question. These problems caused him to have difficulty maintaining employment both before and after the chemical exposure at work. Plaintiff described having hurt people, having walked off of jobs, and having lost many jobs because of arguments with his employers. At the same time that he was telling Dr. Green that his breathing problems had kept him from working, he was reporting to the VA doctors that he had not been able to work due to confrontations with his employers.
19. Throughout all times in question, plaintiff was a body builder and lifted weights, except when he had an acute illness or was hospitalized. He appeared to still be a weight lifter on the date of hearing before the Deputy Commissioner.
20. Plaintiff used cocaine and marijuana before and after the incident of 21 June 1995.
21. As an ironworker, plaintiff was exposed to potentially harmful fumes while welding. Following the incident of 21 June 1995, he worked regularly as an ironworker. The dates and nature of his employments cannot be determined, however, because he would not reveal the information.
22. As a result of the exposure to unknown chemicals at work on 21 June 1995, plaintiff developed chemical pneumonitis, which was a compensable condition. However, he did not develop asthma as a result of his chemical exposure on 21 June 1995. Plaintiff sustained no further disability after he returned to work in September 1995 as a result of his compensable pulmonary condition. Any disability he suffered after September 1995 was related to his personality disorder and psychiatric illness. In addition, plaintiff sustained no permanent impairment as a result of his compensable lung condition.
23. Pursuant to the Form 21 Agreement for Compensation for Disability approved in this case, defendants admitted liability for injuries to plaintiffs "respiratory tract sustained on 21 June 1995. Defendants have now moved that the Form 21 Agreement be set aside based upon information provided by an industrial hygienist who investigated the matter four years after the 21 June 1995 incident. No explanation was offered regarding why an investigation was not made immediately after the incident when reliable information could have been provided. Defendants were in a far better position to investigate the incident at that time than plaintiff, who was the hospital. There was no evidence that the Form 21 Agreement was entered in as the result of fraud or misrepresentation on plaintiffs part, undue influence, or mutual mistake of fact. Although the industrial hygienist was unable to identify a toxic substance in the boiler and ductwork four years later, defendants did not prove that there was no toxic substance there on 21 June 1995. Plaintiff immediately reacted to something blown through the ductwork on that date and was found to be hypoxic by testing at the hospital the following day. No other explanation for his condition of 21 June 1995 has been established. The fact that plaintiff later misrepresented his condition and symptoms did not prove that the original symptoms were false.
***********
Based upon the findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. A settlement agreement which has been approved by the Commission is as binding on the parties as an unappealed award of the Commission, and it cannot be set aside unless there was an error due to fraud, misrepresentation, undue influence, or mutual mistake. G.S. 97-17; Pruittv. Knight Publishing Company, 289 N.C. 254, 221 S.E.2d 355 (1976).
2. Defendants are under an obligation to make a prompt investigation into the facts of a claim. See Calloway vs. Wyatt, 246 N.C. 129,97 S.E.2d 881 (1957).
3. "To permit an employer and carrier to enter into an agreement with an employee and then later contest the agreement solely on the ground that the parties mistakenly believed the injuries to be compensable would seriously undermine the efficacy of the statutory provisions authorizing voluntary settlements by the parties. Buchanan v. Mitchell County,38 N.C. App. 596, 248 S.E.2d 399 (1978), cert. denied 296 N.C. 583,254 S.E.2d 35 (1978).
4. Defendants are not entitled to have the Form 21 Agreement approved in this case set aside because it was not proven that it was entered into as the result of fraud, misrepresentation, undue influence, or mutual mistake of fact. G.S. 97-17.
5. Having sustained no disability due to his compensable lung injury after returning to work in September 1995 and having sustained no permanent impairment as a result of his condition, plaintiff is not entitled to receive further compensation for temporary total or permanent partial disability. G.S. 97-29; G.S. 97-31; Anderson v. Northwestern MotorCompany, 233 N.C. 372, 64 S.E.2d 265 (1951).
6. Plaintiff is not entitled to have defendants provide treatment for his alleged asthma in that he did not develop asthma as a result of his compensable injury or occupational disease of 21 June 1995. G.S. 97-2;97-25; Anderson v. Northwestern Motor Company, 233 N.C. 372, 64 S.E.2d 265
(1951).
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiffs claim for additional benefits under the Act is DENIED.
2. Each side shall pay its own costs.
 S/________________ RENE C. RIGGSBEE COMMISSIONER
CONCURRING:
S/________________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
S/________________________ BERNADINE S. BALLANCE COMMISSIONER